**Case No. 14-30489**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**WORLD WRESTLING ENTERTAINMENT, INC.,**

*Plaintiff – Appellant,*

**vs.**

**UNIDENTIFIED PARTIES,**

*Defendants – Appellees.*

### APPELLANT'S BRIEF

Interlocutory Appeal from the United States District Court
for the Eastern District of Louisiana
Before the Honorable Judge Helen G. Berrigan
U.S.D.C. No. 2:14-CV-688

Danny S. Ashby
    *Counsel of Record*
David I. Monteiro
Justin R. Chapa
K&L GATES LLP
1717 Main Street
Suite 2800
Dallas, Texas 75201
214.939.5500

*Counsel for Appellant*
*World Wrestling Entertainment, Inc.*

July 21, 2014

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 28 and 26.1, the

undersigned counsel of record for Appellant World Wrestling Entertainment, Inc.

certifies that the following persons, firms, partnerships, or corporations have an

interest in the outcome of this case.  These representations are made in order that

the Judges of this Court may evaluate possible disqualification or recusal.

1.  World Wrestling Entertainment, Inc. is the Plaintiff in the district court and
    is the Appellant in this Court.

2.  World Wrestling Entertainment, Inc. is a publicly-traded corporation, and no
    corporation directly or indirectly owns 10% or more of any class of World
    Wrestling Entertainment, Inc.'s equity interests.

3.  Raymond G. Areaux and Emily Lippold Gordy, both of Carver, Darden,
    Koretzky, Tessier, Finn, Blossman & Areaux, LLC, serve as counsel to
    Plaintiff in the district court.

4.  Curtis B. Krasik, Jerry S. McDevitt, and Christopher M. Verdini, all of K&L
    Gates LLP, serve as counsel to Plaintiff in the district court.

5.  Danny S. Ashby, David I. Monteiro, and Justin R. Chapa, all of K&L Gates
    LLP, are counsel to Appellant in this Court.

6.  The Honorable Helen G. Berrigan, District Judge of the United States
    District Court for the Eastern District of Louisiana, presides over this case.


   */s/ Danny S. Ashby*
   Danny S. Ashby
   *Counsel for Appellant*
   *World Wrestling Entertainment, Inc.*

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellant World Wrestling Entertainment, Inc. does not believe this case merits oral argument. The Court may resolve this appeal by reference to the plain language of the relevant statute and thirty years of case law applying that statute, the vast majority of which supports the relief Appellant sought in the district court.

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................iv

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE CASE..................................................................................3

    I.      Preliminary Statement ...........................................................3

    II.     Factual and Procedural Background .....................................................5

STANDARD OF REVIEW ....................................................................................14

ARGUMENT ........................................................................................................15

    I.      Trademark Owners May Seize Counterfeits from Doe
          Defendants...........................................................................................16

    II.     Section 1116(d) Adequately Protects Suspected
          Counterfeiters' Rights. ........................................................................21

    III.    The District Court's Order Generally Misinterprets
          § 1116(d). ...........................................................................................25

    IV.    This Appeal Is Not Moot.....................................................................27

CONCLUSION .....................................................................................................29

CERTIFICATE OF SERVICE ..............................................................................31

CERTIFICATE OF COMPLIANCE......................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bivens v. Six Unknown Named Agents*,
   403 U.S. 388 (1971)............................................................................16, 17

*Church of Scientology v. United States*,
   506 U.S. 9 (1992)...................................................................................28

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985)...............................................................................21

*Gen. Motors Corp. v. Gibson Chem. & Oil Co.*,
   786 F.2d 105 (2d Cir. 1986) ................................................................24

*Gilbert v. Homar*,
   520 U.S. 924 (1997)...............................................................................21

*Gucci Am., Inc. v. Accents*,
   955 F. Supp. 279 (S.D.N.Y 1999) ......................................................24

*Hsu v. Intel Corp.*,
   1993 WL 362236 (9th Cir. Sept. 17, 1993) .......................................23

*Joel v. Does*,
   499 F. Supp. 791 (E.D. Wis. 1980) ...................................................20

*Jones v. Flowers*,
   547 U.S. 220 (2006)...............................................................................22

*Kinnison v. City of San Antonio*,
   480 F. App'x 271 (5th Cir. 2012) .......................................................25

*Larbie v. Larbie*,
   690 F.3d 295 (5th Cir. 2012) .........................................................27, 28

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*,
   453 F.3d 377 (6th Cir. 2006) ..............................................................20

*Lorillard Tobacco Co. v. Bisan Food Corp.*,
   377 F.3d 313 (3d Cir. 2004) ................................................................14, 18, 29

*Maclin v. Paulson*,
   627 F.2d 83 (7th Cir. 1980) ...............................................................................16

*Mitchell v. W.T. Grant Co.*,
   416 U.S. 600 (1974)...........................................................................................24

*Moon Records v. Does*,
   No. 81-CV-907, 1981 WL 47050 (N.D. Ill. Feb. 26, 1981)..............................20

*Morrissey v. Brewer*,
   408 U.S. 471 (1972)...........................................................................................21

*NBA Props. v. Does*,
   No. 97-4069, 1997 WL 271311 (10th Cir. May 21, 1997) ..........................18, 24

*North Face Apparel Corp. v. TC Fashions, Inc.*,
   No. 05-CV-9083, 2006 WL 838993 (S.D.N.Y. Mar. 30, 2006)........................19

*Paramount Pictures Corp. v. Doe*,
   821 F. Supp. 82 (E.D.N.Y. 1993) ......................................................................24

*Plant v. Does*,
   19 F. Supp. 2d 1316 (S.D. Fla. 1998) ................................................................19

*RBIII, L.P. v. City of San Antonio*,
   713 F.3d 840 (5th Cir. 2013) ........................................................................22, 25

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
   970 F.2d 552 (9th Cir. 1992) .............................................................................18

*Rock Tours, Ltd. v. Does*,
   507 F. Supp. 63 (N.D. Ala. 1981)......................................................................19

*S. Pac. Terminal Co. v. ICC*,
   219 U.S. 498 (1911)...........................................................................................29

*SKS Merch., LLC v. Barry*,
   233 F. Supp. 2d 841 (E.D. Ky. 2002)................................................................19

*Time Warner Entm't Co. v. Does Nos. 1-2*,
    876 F. Supp. 407 (E.D.N.Y. 1994) ....................................................24

*Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.*,
    924 F. Supp. 17 (S.D.N.Y. 1996) ......................................................19

*In re Volkswagen of Am., Inc.*,
    545 F.3d 304 (5th Cir. 2008) (en banc) ...........................................15

*In re Vuitton et Fils S.A.*,
    606 F.2d 1 (2d Cir. 1979) ....................................................18, 20, 29

*Vuitton v. White*,
    945 F.2d 569 (3d Cir. 1991) ...............................................17, 18, 29

*Waco Int'l, Inc. v. KHK Scaffolding Hous. Inc.*,
    278 F.3d 523 (5th Cir. 2002) ....................................................14, 26

## Statutes

15 U.S.C. § 1116(d) ...........................................................*passim*

15 U.S.C. § 1121 ............................................................................1

28 U.S.C. § 1292(b) ........................................................................1

28 U.S.C. § 1338 ............................................................................1

28 U.S.C. § 1367 ............................................................................1

Fed. R. App. P. 5 ............................................................................1

## Other Authorities

U.S. Const. amend. IV .............................................................18, 25

Michael D. McCoy & James D. Myers, Ex Parte *Seizure Order*
    *Practice After the Trademark Counterfeiting Act of 1984*,
    14 AIPLA Q.J. 237 (1986)..............................................................20

S. Rep. No. 98-526 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3627.................*passim*

## **JURISDICTIONAL STATEMENT**

The United States District Court for the Eastern District of Louisiana has jurisdiction over this case under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1338 and 1367. This case presents claims under federal and state trademark and unfair competition laws. On April 1, 2014, the district court *sua sponte* certified for interlocutory appeal its order denying Plaintiff's *ex parte* motion for temporary restraining order, order for seizure of counterfeit marked goods, and order to show cause why a preliminary injunction should not issue. Appellant filed a Petition for Permission to Appeal on April 11, 2014, within ten days after entry of the district court's certification order, as required by 28 U.S.C. § 1292(b) and Federal Rule of Appellate Procedure 5. This Court granted permission to appeal on May 20, 2014.

## STATEMENT OF THE ISSUE

This case presents a single question of law: may *ex parte* seizure and temporary restraining orders authorized by federal trademark law issue against initially unnamed defendants who are allegedly engaged in "fly-by-night" counterfeiting?

## <u>STATEMENT OF THE CASE</u>

### I.    Preliminary Statement

World Wrestling Entertainment, Inc. ("<u>WWE</u>"), like other major entertainment properties and sports leagues, earns a significant amount of revenue from merchandise sales.  In an effort to profit from such success, counterfeiters find it lucrative to sell inauthentic and low-quality versions of WWE's merchandise at WWE events.  These bootleggers appear unannounced shortly before WWE events and then quickly close up shop, transporting their counterfeit goods to the location of WWE's next show.  Unsurprisingly, these individuals take great efforts to keep their identities and whereabouts unknown.

This problem is widespread and not unique to WWE.  For that reason, Congress enacted the Trademark Counterfeiting Act's *ex parte* seizure provision.  *See* 15 U.S.C. § 1116(d).  That statutory remedy affords trademark owners like WWE the ability to seize and impound suspected counterfeit merchandise from bootleggers—without prior notice—pending a court hearing to occur a short time thereafter.  The same provision simultaneously protects the interests of alleged counterfeiters by, among other things, requiring that court proceedings remain sealed until they have had an opportunity to challenge the seizure order.  Alleged counterfeiters may even sue trademark owners for wrongful seizure.

Section 1116(d) admittedly provides WWE with a strong antidote to counterfeiting. That is precisely the design and intent of the statute: Congress explicitly contemplated that *ex parte* seizure orders were necessary to combat counterfeiting by "unknown third parties" likely to use "whatever means" necessary to further their illegitimate enterprises while holding courts and trademark owners at bay. *See, e.g.*, S. REP. NO. 98-526, at 7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3627, 3633.

The district court denied WWE's request for a seizure order here despite finding that WWE met § 1116(d)'s statutory prerequisites and acknowledging that courts routinely grant such relief. It did so by requiring WWE to satisfy a requirement found neither in the statute nor its legislative history and that is unnecessary given § 1116(d)'s extant due-process protections. In the district court's view, trademark owners may obtain a seizure order against *unknown* counterfeiters only if they first provide the court with "specific facts" about the counterfeiters' *identities*. This judicially-created element effectively forecloses the only meaningful remedy WWE has to fight the "fly-by-night" counterfeiting targeted by § 1116(d).

This Court should hold that neither § 1116(d) nor due process obligates trademark owners to satisfy the requirements imposed by the district court. <u>*First*</u>, § 1116(d)'s legislative history and text—as well as the overwhelming majority of

seizure cases—support the temporary seizure of suspected counterfeit merchandise from anonymous defendants. District courts nationwide regularly approve "John Doe" seizure requests like WWE's.

_Second_, Congress crafted § 1116(d) to account for the due-process concerns underlying the district court's order. Section 1116(d) provides suspected counterfeiters with ample procedural and substantive protections to preserve their property rights and to contest—and recover for—the wrongful seizure of their merchandise.

_Finally_, this action is not moot. Reversal by this Court will permit WWE to identify _and_ serve suspected counterfeiters and their associates contemporaneously during seizure—as intended by § 1116(d)'s _ex parte_ procedures—increasing the effectiveness of trademark enforcement. At minimum, and as the Second Circuit long ago recognized in a similar case, the legal issues here are "capable of repetition" but will "evade review" in future cases without this Court's guidance.

Accordingly, WWE respectfully asks this Court to REVERSE the district court's order and REMAND for further proceedings.

## II.    Factual and Procedural Background

WWE provides live and televised wrestling-based sports entertainment. _See, e.g._, ROA.9-12. In connection with the development and production of its

programming, WWE makes extensive investments in the creation, promotion, and protection of its intellectual property, which includes hundreds of federally registered trademarks such as WWE®, the WWE logo (W)®, and Wrestlemania® (the "WWE Marks"). *See, e.g.*, ROA.9-12; ROA.29-92; ROA.115-17. WWE derives significant goodwill and value from the WWE Marks, which are uniquely associated with WWE and its programming. *See, e.g.*, ROA.6; ROA.16-17; ROA.109-10, ROA.145.

Each year, WWE produces a multi-city series of live events throughout the United States and around the world. *See, e.g.*, ROA.140-41; ROA.145-46. WWE live events consist of (1) pay-per-view programs, (2) nationally-televised shows, and (3) non-televised events known as "house shows." *See* ROA.10; ROA.116. WWE generally produces several live events each week and one live pay-per-view program each month. *See, e.g.*, ROA.10-12; ROA.94-105. WWE's premier annual pay-per-view program since its inception in 1985 has been "Wrestlemania®," and the live events leading up to "Wrestlemania®" are known as "The Road to Wrestlemania®." *See, e.g.*, ROA.10-11; ROA.135; ROA.152-57. WWE publicizes all of these live events in advance to enable its fans to purchase tickets and to make travel plans.[1] *See* ROA.10; ROA.94-105; ROA.134.

---

[1] The 2013 Wrestlemania® XXIX event at MetLife Stadium in East Rutherford, New Jersey drew a sold out crowd of 80,676 spectators from all 50 states as well as 34 foreign countries. ROA.11.

At its live events, WWE sells clothing, souvenirs, and other merchandise that prominently display the WWE Marks along with other WWE intellectual property. *See* ROA.11-13; ROA.116-17. WWE's gross revenues from these sales exceed $18 million annually. ROA.12-13.

As a result of WWE's popularity and the well-publicized schedule of its live events, bootleggers find it profitable to appear at those events to sell inauthentic merchandise bearing counterfeits of the WWE Marks. *See* ROA.12-20; ROA.139-50; ROA.152-57. These counterfeiters are accountable to no one, whether for payment of royalties, sales taxes, or quality control. *See id.* Their unauthorized sales usually take place in front of host venues, in adjacent parking lots, and on surrounding streets. *See id.*

The counterfeiters operate as a clandestine, travelling manufacturing and distribution enterprise that uses elusive, well-coached, and largely anonymous street vendors to peddle bootleg merchandise. *See id.* Based on the common designs of counterfeit merchandise that WWE has observed sold at its live events, WWE believes that the counterfeiters are part of a nationwide network of manufacturers and wholesalers. *See id.* They unfairly—and unlawfully—exploit and profit from the considerable commercial value and goodwill attached to the WWE Marks.

The Trademark Counterfeiting Act of 1984 provides WWE with a means to protect its interests in the WWE Marks. *See* 15 U.S.C. § 1116(d). WWE has successfully used that statutory remedy to obtain *ex parte* TROs and seizure orders almost every year between 2000 and 2013 from district courts across the country. *See* ROA.301-451. In each of those cases, as here, WWE initially proceeded against unnamed Does because, as a practical matter, WWE cannot know in advance the specific identities of the counterfeiters who will present themselves at any given show.

WWE can readily identify counterfeit merchandise, however, because it has authorized designs and "RN" numbers that do not appear on counterfeit merchandise. ROA.707. WWE also makes its merchandise sales directly. It does not license third parties to sell merchandise at live events. ROA.140-41. Thus, anyone who is not affiliated with WWE who nonetheless sells merchandise bearing the WWE Marks at or near a live event is almost certainly a counterfeiter or a person engaged in the sale of counterfeit goods.

The counterfeiters' very *modus operandi* is to operate anonymously, without any identification, licenses, or addresses. If confronted, they almost always either refuse to provide contact information or give false information. *See, e.g.*, ROA.142. Even in those few instances when counterfeiters accept service or provide accurate identification, they never enter an appearance or object to the

seizure. *See, e.g.*, ROA.148. Given notice of WWE's claims, the counterfeiters usually destroy or secrete their goods rather than make them available to the court and WWE, as would be required in a typical civil action. *See, e.g.*, ROA.128; ROA.149. The counterfeiters thus effectively prevent WWE from engaging in discovery to learn, among other things, the source of the counterfeit merchandise and information about the specific street vendors that may appear at other live events. *See* ROA.145-49.

WWE's experience this past year was no different. On March 27, 2013, WWE obtained a TRO and seizure order from the United States District Court for the District of New Jersey for Wrestlemania® XXIX. *See* ROA.14-15; ROA.143-44; ROA.153-57. WWE encountered scores of counterfeiters at Wrestlemania® XXIX. Armed with the court's TRO and seizure order, WWE was able to seize thousands of articles of counterfeit merchandise—much of which the counterfeiters abandoned without accepting service or providing WWE with any identification—and even managed to serve ten counterfeiters. *See, e.g.*, ROA.153-57. A large portion of these counterfeit items were seized at a nearby third-party wrestling exposition, intentionally scheduled to coincide with Wrestlemania® XXIX so that counterfeiters could capitalize on selling merchandise to the thousands of WWE

fans attending WWE-affiliated events.[2]   ROA.155.   As usual, no defendant appeared in the district court to challenge any seizure.  ROA.148.  Following a hearing in which WWE presented evidence that the counterfeiters would follow WWE through its live events for 2013-2014, the court entered a preliminary injunction and seizure order that expired on April 1, 2014.  ROA.301-12.

For the duration of the preliminary injunction and seizure order, WWE enforced the order at its live events throughout the United States.  ROA.153-56.  Consistent with WWE's prior experiences, WWE seized merchandise from various cities on different dates from different people—who refused to identify themselves—yet the artwork on the bootleg merchandise depicted the same artwork and list of dates from the 2013-2014 live events schedule.  *See, e.g.*, ROA.153-56; ROA.208.  For example, in January 2014 in Baltimore, Maryland, WWE seized counterfeit "Road to Wrestlemania" merchandise that referenced Wrestlemania® XXX, the Wrestlemania® XXX tagline, "Let the Good Times Roll," and included WWE's live event tour dates through July 2014.  ROA.208.  Then, on the eve of Wrestlemania® XXX that was scheduled for April 6, 2014 in New Orleans, Louisiana, WWE encountered the same counterfeit "Road to Wrestlemania" shirts at live events in New York and New Jersey.  ROA.706.

---

[2] Significantly, the organizers of the third-party event advertised that their 2014 exposition would take place in New Orleans to again coincide with Wrestlemania®. ROA.155.

In light of the foregoing specific indications of counterfeiting anticipated at Wrestlemania® XXX and throughout WWE's 2014-2015 events, and with the New Jersey federal district court's preliminary injunction and seizure order set to expire on April 1, 2014, *see, e.g.*, ROA.706-07, WWE sued in Louisiana federal district court on various trademark and state-law claims and moved for a TRO and seizure order on March 26, 2014.    WWE's pleadings, affidavits, and accompanying documents described in detail its prior experiences with counterfeiters and the reasons it believed illegal counterfeiting activities would take place at Wrestlemania® XXX and other WWE-related events in New Orleans.    *See generally* ROA.6-557.    That evidence established that WWE's efforts to obtain counterfeiters' actual names and addresses have been thwarted by the counterfeiters through numerous evasive tactics, including failing to carry identification, fleeing when approached by WWE officials, and giving false information.    WWE's evidence also contained specific facts about where it reasonably expected the counterfeiters to be located: near the venues hosting Wrestlemania® XXX events and the surrounding streets and parking areas.    *See, e.g.*, ROA.146.    Additionally, WWE extensively detailed the external operations of the illicit manufacturing and distribution enterprises at issue and how they use street vendors to flood WWE's live events with counterfeit merchandise.    *See, e.g.*, ROA.142; ROA.145-49.

The district court acknowledged that WWE's evidence showed that the alleged counterfeiting threat is "real," that it "cannibalizes Plaintiff's merchandise sales by purveying unauthorized and sometimes even inferior products," and that it constitutes "real harm . . . that can cause irreparable injury to Plaintiff's marks." ROA.635-36; ROA.640-41.

The district court nevertheless denied WWE's motion based on its view that WWE must provide additional "specific facts" about the counterfeiters' identities before it may obtain a seizure order. The district court found problematic that WWE's requested relief "is not directed against a single named, identified, or even described person" and that WWE purportedly "provides no particular information about the identity of any of [the Does]." ROA.636. Without this information, the district court concluded that the procedures and relief authorized by § 1116(d) would permit WWE to privately adjudicate whether any seized goods are in fact counterfeit and to collect evidence against the defendants without due process.

WWE nonetheless worked with local law enforcement to identify and to prevent the sale of counterfeit merchandise when the Wrestlemania® XXX events began on April 3, 2014. Through this alternative process, WWE obtained the putative names of four specific individuals who were caught selling counterfeit merchandise. *See, e.g.*, ROA.1151-1209 [Sealed DE 26]. As predicted, however,

WWE obtained contact information for only some of these individuals, and even that information proved to be false.

WWE then filed two amended Motions for TRO and Seizure Order against these individuals and those in active concert and participation with them. *See, e.g.*, ROA.1151-1209 [Sealed DE 26]. In further confirmation of WWE's factual assertions, two of the four individuals identified were previously served in Miami in 2012 pursuant to an *ex parte* TRO and seizure order granted by the Southern District of Florida in connection with Wrestlemania® XXVIII. *See id.*; *see also* ROA.145; ROA.148. Neither individual appeared in that action to contest the seizure, and the court converted the TRO and seizure order into a preliminary injunction and seizure order against them. ROA.145; ROA.148. Here, too, WWE learned of potential alternative addresses for two individuals and attempted service at those locations, but neither putative defendant has returned process or entered an appearance.

Although the district court here granted two amended Motions for TRO and Seizure Order, it expressly directed the clerk not to issue summons to anyone other than named defendants, sharply limiting WWE's ability to seek relief against those in active concert and participation with the now-named defendants. *See* ROA.960-1028 [Sealed DE 19]; ROA.1210-92 [Sealed DE 27]. The district court therefore continues to interpret and apply § 1116(d) to provide only a retroactive remedy

against known defendants, as opposed to the vital tool of relief against anticipated—yet inherently unknowable—bootleggers that Congress intended.

## SUMMARY OF THE ARGUMENT

Congress drafted § 1116(d) with the express purpose of providing trademark owners like WWE a remedy against fly-by-night counterfeiters. The district court acknowledged that WWE's evidence satisfied the elements necessary for a seizure order to issue, but it declined to order that relief by reading an additional and unworkable requirement into the statute. Section 1116(d)'s built-in procedural and substantive protections adequately address suspected counterfeiters' property and reputational interests. The district court recognized the novelty of its approach and *sua sponte* certified its order for interlocutory appeal. The Court should take this opportunity to provide guidance on issues that are "capable of repetition" but likely to "evade review" given the often incomplete nature of counterfeit seizure litigation. The Court should reverse the district court's order and remand for further proceedings.

## STANDARD OF REVIEW

Courts review the denial of motions for counterfeit seizure orders under the same abuse of discretion standard applicable to denials of injunctive relief. *See Lorillard Tobacco Co. v. Bisan Food Corp.*, 377 F.3d 313, 319 (3d Cir. 2004); *Waco Int'l, Inc. v. KHK Scaffolding Hous. Inc.*, 278 F.3d 523, 528-29 (5th Cir.

2002). "As a general matter, a court's exercise of its discretion is not unbounded; that is, a court must exercise its discretion within the bounds set by relevant statutes and relevant, binding precedents." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc). "'A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts.'" *Id.* (citation omitted).

## ARGUMENT

The district court abused its discretion by drawing erroneous legal conclusions regarding the nature, purpose, and scope of counterfeit seizure orders. It read § 1116(d) to require that WWE make a particularized showing as to the unnamed counterfeiters' identifies *before* obtaining a seizure order, ROA.636-40, such as "physical descriptions or photographs." ROA.640. That analysis, in turn, broadened into generalized concerns about the constitutionality and practical wisdom of § 1116(d)'s procedures. *See, e.g.*, ROA.641-42 ("But Plaintiff's proposed solution—seize what goods Plaintiff decides are counterfeit from what persons Plaintiff thinks should merit a seizure order under [§] 1116(d)(4)(B)—runs afoul not just of statutory text, but potentially of limits on the very power of the Court such as ripeness, due process, and personal jurisdiction. . . .  [D]oes due process allow the Court to deputize a plaintiff to determine which goods are seizable, all while cloaking Plaintiff in the protection of a judicial order?").

This "particularized description" requirement, ROA.640, forces WWE to use procedures at odds with § 1116(d) and the case law applying it, vitiating the no-prior-notice regime intended by Congress. *See, e.g.*, S. REP. NO. 98-526, at 7, *reprinted in* 1984 U.S.C.C.A.N. at 3633 ("In the face of widespread use of such bad faith [fly-by-night] tactics, the committee believes that the careful use of ex parte orders is fully warranted.").

## I.     Trademark Owners May Seize Counterfeits from Doe Defendants.

WWE has found no case law that precisely addresses the extent to which trademark owners must identify suspected counterfeiters before an *ex parte* seizure order will issue.  This "vacuum of reasoned authority" on the subject prompted the district court to *sua sponte* certify its order for interlocutory appeal.  ROA.643-44. It is not the case, however, that no authorities speak to the issue or the district court's broader questions about the use of *ex parte* seizure orders like that requested here.

As an initial matter, the district court faulted WWE for filing suit against as-yet unnamed Doe defendants.  But the use of fictitious names for defendants "has been routinely approved without discussion." *See, e.g.*, *Maclin v. Paulson*, 627 F.2d 83, 87 (7th Cir. 1980) (citing *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)).   When "a party is ignorant of defendants' true identity, it is *unnecessary to name them until their identity can be learned* through discovery or

through the aid of the trial court." *Id.* (emphasis added).  Nothing in § 1116(d) undermines this general rule.  There are few, if any, effective pre-suit means by which to identify underground counterfeiters, who surface only in the few hours surrounding WWE's live events.

Notably, the portion of § 1116(d) that approximates the district court's particularized description requirement imposes the duty to give such a description *only* for the location to be searched and the items to be seized.  *See* 15 U.S.C. § 1116(d)(5)(B); *see also* 15 U.S.C. § 1116(d)(3)(B) (requiring seizure order applicants to provide "the additional information required by paragraph (5) of this subsection").  Congress, in fact, meant for trademark owners to use counterfeit seizure orders against defendants dedicated to concealing their identities, operations, and whereabouts.  *See, e.g.*, S. Rep. No. 98-526, at 6-7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3627, 3632-33.

To that end, the Third Circuit has held that a district court abused its discretion in refusing to issue an *ex parte* seizure order in a case brought by a plaintiff dealing with much the same problem as WWE.  *See Vuitton v. White*, 945 F.2d 569, 570-71 (3d Cir. 1991).  Like the district court here, the *Vuitton* district court agreed that the plaintiff satisfied almost every requirement under § 1116(d) but declined to order relief.  *See id.* at 574-76.  The Third Circuit reversed, concluding that the refusal to authorize a seizure under such circumstances could

not be "reconciled with the district court's own factual findings and a proper interpretation of the statute." *Id.* at 575. Indeed, the court observed that if it "were to conclude that a § 1116 seizure order would be inappropriate in [that] case, [it] would be hard pressed to imag[ine] a case in which such an order would be appropriate." *Id.* at 575-76; *cf. Bisan Food Corp.*, 377 F.3d at 320-21 (distinguishing "small independent retailers with fixed places of business" from "street vendors," who "common sense suggests" are appropriate targets for a seizure order).

Other circuits have reached similar conclusions on analogous facts. *See Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 558 (9th Cir. 1992) (observing that § 1116(d) "undisputedly authorize[d]" the district court's injunction because it "explicitly authorizes the prejudgment seizure of counterfeit goods"); *In re Vuitton et Fils S.A.*, 606 F.2d 1, 1-6 & n.5 (2d Cir. 1979) (granting mandamus relief after district court denied motion for seizure and TRO; noting that the "*ex parte* temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief"); *see also NBA Props. v. Does*, No. 97-4069, 1997 WL 271311, at *1 (10th Cir. May 21, 1997) (holding that an *ex parte* seizure order and TRO issued against unnamed defendants satisfied § 1116(d) and the Fourth Amendment).

The district court's order not only goes against the grain of circuit court case law, it is an outlier among district court authority. In addition to the many district courts that have granted WWE the same relief it seeks here, ROA.301-451, numerous other courts have issued *ex parte* seizure orders even where defendants are initially unidentified. *See, e.g.*, *North Face Apparel Corp. v. TC Fashions, Inc.*, No. 05-CV-9083, 2006 WL 838993, at *1 (S.D.N.Y. Mar. 30, 2006); *SKS Merch., LLC v. Barry*, 233 F. Supp. 2d 841, 843-51 (E.D. Ky. 2002); *Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.*, 924 F. Supp. 17, 18 (S.D.N.Y. 1996); *see also* ROA.452-556 (collecting nearly twenty examples of *ex parte* seizure orders issued against unidentified defendants). Courts have done so where, as here, the defendants themselves have made identification impossible absent relief, the bootleg merchandise was not isolated, and the relief sought was limited to only those defendants who were selling counterfeit merchandise and served.[3] *See, e.g., SKS Merch.*, 233 F. Supp. 2d at 848-50.

---

[3] To be sure, some courts have denied motions for *ex parte* seizure orders for reasons similar to those expressed by the district court. But those cases, in addition to being a minority, typically have done so out of concerns addressed by Congress when it enacted § 1116(d). *See, e.g.*, *Plant v. Does*, 19 F. Supp. 2d 1316 (S.D. Fla. 1998) (criticizing *ex parte* seizure orders primarily in reliance in pre-§ 1116(d) case law, without addressing § 1116(d)); *Rock Tours, Ltd. v. Does*, 507 F. Supp. 63, 66 (N.D. Ala. 1981) (denying seizure order before § 1116(d) because lack of named defendants presented justiciability and other concerns that the court believed were "more appropriately addressed to the legislative or executive branches").

Before Congress enacted § 1116(d), courts issued seizure orders as a form of equitable relief for largely the same reasons. Seizure orders mitigate the irreparable harm inevitably caused by counterfeiting and pose no due-process concerns so long as Doe defendants have the opportunity to vindicate their rights. *See, e.g.*, *In re Vuitton et Fils*, 606 F.2d at 4 ("In a trademark infringement case such as this, a substantial likelihood of confusion constitutes, in and of itself, irreparable injury . . . ."); *Moon Records v. Does*, No. 81-CV-907, 1981 WL 47050, at *1 (N.D. Ill. Feb. 26, 1981) (holding that the "problem regarding the identity of the [unknown] defendants will be met by requiring copies of the complaint and [the] restraining order to be served upon all persons from whom infringing merchandise is seized," permitting them "to appear in court to contest the seizures at [a] hearing" scheduled the following week, and obligating the plaintiff to post a bond); *Joel v. Does*, 499 F. Supp. 791, 792 (E.D. Wis. 1980) (same, despite initially finding the requested relief "troubling").[4]

Accordingly, WWE was not obligated to set forth "specific facts" about the "persons" selling counterfeit goods to obtain a seizure order under § 1116(d). That

---

[4] *See also Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006) ("[I]rreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears from infringement or unfair competition." (internal quotation marks and citations omitted)); Michael D. McCoy & James D. Myers, Ex Parte *Seizure Order Practice After the Trademark Counterfeiting Act of 1984*, 14 AIPLA Q. J. 237, 238 n.2 (1986) (collecting pre-§ 1116(d) cases authorizing *ex parte* seizure orders).

restriction essentially requires WWE to give notice that it intends to seize goods from "fly-by-night" counterfeiters, a result supported by neither § 1116(d)'s text or underlying purposes.

## II.     Section 1116(d) Adequately Protects Suspected Counterfeiters' Rights.

Much of the district court's other concerns addressed perceived infirmities in § 1116(d)'s procedural protections.  *See, e.g.*, ROA.639 ("This proposed procedure, which effectively uses a [§] 1116(d) seizure order to force Defendants to identify themselves (or lose their goods), is superficially appealing but it puts the cart before the horse.").  Congress, however, designed the statute to "provide[] stringent safeguards against abuse of ex parte seizure orders."  S. REP. NO. 98-526, at 7, *reprinted in* 1984 U.S.C.C.A.N. at 3633.  Those safeguards ensure that suspected counterfeiters receive sufficient due process.

Due process generally requires notice and an opportunity for a hearing before a property deprivation occurs.  *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  But the Supreme Court has also recognized that "due process is flexible and calls for such procedural protections as the particular situation demands."  *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  This includes permitting property deprivations without notice under certain circumstances where time is of the essence "or where it would be impractical to provide predeprivation process."  *See, e.g.*, *Gilbert v. Homar*, 520 U.S. 924, 930

(1997) (collecting cases); *cf. Jones v. Flowers*, 547 U.S. 220, 226 (2006) ("Due process does not require that a property owner receive actual notice before the government may take his property." (citation omitted)). In such cases, due process turns on whether the property deprivation occurred pursuant to "valid" statutory procedures and afforded the property owner adequate post-deprivation process. *See RBIII, L.P. v. City of San Antonio*, 713 F.3d 840, 844-45 (5th Cir. 2013).

Section 1116(d) provides strong protections to suspected counterfeiters' interests both before and after seizure. Trademark owners cannot seize counterfeit merchandise on their own terms and without government oversight. They must notify the "United States attorney for the judicial district in which such order is sought" of their plans *before* proceeding to court; district courts *cannot* "receive an application" for a seizure order otherwise. *See* 15 U.S.C. § 1116(d)(2). That application must contain specific and verified factual information, *see id.* § 1116(d)(3), and the district court "shall not grant such an application unless" it finds that the request meets several statutorily enumerated prerequisites, *see id.* § 1116(d)(4)(B). Trademark owners, moreover, must post a bond to cover any "damages" caused by the seizure, *see id.* § 1116(d)(4)(A), and may effectuate a seizure only under the supervision of a federal, state, or local "law enforcement officer," *see id.* § 1116(d)(9).

The statute also makes available a number of substantive protections.  To ensure that defendants suffer no reputational harm from potentially unmeritorious seizure proceedings, district courts are required to "take appropriate action to protect" suspected counterfeiters from undue "publicity."  *See id.* § 1116(d)(6). Any seizure order and "supporting documents" must "be sealed until the person against whom the order is directed has an opportunity to contest such order," *see id.* § 1116(d)(8), which cannot be held later than fifteen days after the seizure order issues, *id.* § 1116(d)(10)(A).  Seized merchandise must remain in the court's "custody" and may be made subject to appropriate "protective orders."  *See id.* § 1116(d)(7).

Under § 1116(d), the burden to justify the seizure at all times remains on the trademark owner.  *See id.* § 1116(d)(10)(A).  The failure to carry that burden requires the seizure order to "be dissolved or modified appropriately," *id.*, and enables the targets of seizure orders to sue trademark owners for "wrongful seizure" and seek a panoply of damages, *see id.* § 1116(d)(11).

In recognition of these protections, the few courts that have directly addressed the issue have held that § 1116(d)'s procedures are facially constitutional, even if they are not immune to as-applied challenges.[5]  *See, e.g.,*

---

[5] At least two circuit courts have implicitly reached the same conclusion.  *See Hsu v. Intel Corp.*, 1993 WL 362236, at *1-2 (9th Cir. Sept. 17, 1993) (rejecting defendant's argument that it lacked a "full and fair opportunity to contest the

*NBA Props.*, 1997 WL 271311, at *1; *Gucci Am., Inc. v. Accents*, 955 F. Supp. 279, 282 (S.D.N.Y 1999) (rejecting defendants' constitutional arguments because the plaintiff satisfied § 1116(d)'s "careful requirements for issuance of the seizure orders"); *Time Warner Entm't Co. v. Does Nos. 1-2*, 876 F. Supp. 407, 411 n.3, 412 (E.D.N.Y. 1994). WWE's request here, in fact, meets the due-process requirements outlined by the Supreme Court in considering an analogous "ex parte prejudgment seizure of a defendant's property" under a state law similar to § 1116(d):

> (1) the availability of ex parte prejudgment seizure must be limited to situations where plaintiff has established that the property to be seized is of a type that can be readily concealed, disposed of, or destroyed; (2) the plaintiff must allege specific facts based on actual knowledge supporting the underlying action and the right of plaintiff to seize the property; (3) the application for the order of seizure must be made to a judge rather than to a clerk; (4) the defendant has a right to a prompt, postseizure hearing to challenge the seizure; and (5) the defendant must be able to recover damages from the plaintiff if the taking was wrongful and to regain possession of the seized items by filing a bond.

*Cf. Paramount Pictures Corp. v. Doe*, 821 F. Supp. 82, 87-88 (E.D.N.Y. 1993) (citing *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 616-18 (1974)).

---

seizure order"; defendant "received a copy of the order, supporting memoranda and evidence at the time of the seizure"); *Gen. Motors Corp. v. Gibson Chem. & Oil Co.*, 786 F.2d 105, 109 (2d Cir. 1986) (holding that combination of § 1116(d)'s procedural protections and opportunity for post-seizure hearing adequately protected defendant's property rights pending trial and appellate review).

Congress intended seizure orders to be used against fly-by-night counterfeiters, and it made ample provision for the protection of their rights and property interests. Section 1116(d) accordingly satisfies due process facially and as applied to the facts of this case.[6] WWE respectfully requests that this Court reach the same conclusion and reverse the district court's order.

## III.   The District Court's Order Generally Misinterprets § 1116(d).

The district court denied WWE's motion based on other misreadings of § 1116(d). For example, it concluded that WWE resorted to a civil *ex parte* seizure and injunction request on the assumption that WWE "has difficulty convincing law enforcement to make[] its needs a priority or in order to insulate itself from the liability that may attach to swearing out criminal complaints against vendors on an *ad hoc* basis should a complaint prove unfounded." ROA.641. That assumption is belied by § 1116(d)'s text and legislative history: Congress specifically intended to provide trademark owners like WWE with a civil *ex parte* seizure remedy. *See, e.g.*, S. REP. NO. 98-526, at 2, *reprinted in* 1984 U.S.C.C.A.N. at 3628 ("The bill provides that under certain defined circumstances, a private party may obtain a

---

[6] The district court's order also alludes to various Fourth Amendment concerns. This Court, however, has adopted a "'general practice of tethering the outcome of the Fourth Amendment inquiry to whether the property deprivation offended due process.'" *RBIII*, 713 F.3d at 846 (quoting *Kinnison v. City of San Antonio*, 480 F. App'x 271, 281 (5th Cir. 2012)). That § 1116(d) provides adequate due process thus also addresses any constitutional concerns arising under the Fourth Amendment.

court order to seize counterfeit goods without giving advance notice to the defendant.").

Trademark owners need not satisfy heightened pleading or evidentiary burdens to access that remedy. Plaintiffs may seek relief under the Trademark Counterfeit Act through notice pleading and regardless of whether they "have conclusive [pre-suit] proof that the defendant has intentionally trafficked in known counterfeits." *See* S. REP. NO. 98-526, at 19, *reprinted in* 1984 U.S.C.C.A.N. at 3645.

And it is incorrect that § 1116(d) shields WWE from liability for improperly seizing goods or acting in bad faith. The statute affords defendants a cause of action for "wrongful seizure" to guard against that precise abuse. *See* 15 U.S.C. § 1116(d)(11). That remedy has teeth. It makes available damages for "lost profits, cost of materials, loss of good will," attorneys' fees, and even punitive damages, *see id.*, and it has been used effectively against trademark owners who haphazardly seek seizure orders, *see, e.g.*, *Waco Int'l*, 278 F.3d at 529-37.

The district court elsewhere criticized WWE for requesting that the show-cause hearing be scheduled for fourteen days from the date the seizure order was signed, reasoning that § 1116(d)(5)(C) requires that such orders are effective for only seven days. ROA.639. But the cited provision applies to the amount of time WWE would have had to *execute* the seizure order had the district court signed it.

*See* 15 U.S.C. § 1116(d)(5)(C) ("An order under this subsection shall set forth—the time period, which shall end not later than seven days after the date on which such order is issued, *during which the seizure is to be made*[.]" (emphasis added)). The provision concerning when the "court shall hold a hearing" permits the hearing to be scheduled "not sooner than ten days after the order is issued and not later than fifteen days after the order is issued" with limited exceptions. 15 U.S.C. § 1116(d)(10)(A). WWE properly requested a hearing date to be set fourteen days after the district court signed the seizure order.

These legal errors, in addition to those discussed above, establish that the district court abused its discretion in refusing to enter a seizure order. WWE therefore respectfully requests that this Court reverse the district court's order and remand the case for further proceedings consistent.

## IV.    This Appeal Is Not Moot.

Although the Court has not raised the question, WWE addresses the issue of mootness here because (1) the events surrounding Wrestlemania® XXX ended during the pendency of this appeal and (2) no defendants have entered an appearance in the district court or this Court at the time of filing this brief. "'[C]ompliance [with a trial court's order] does not [ordinarily] moot an appeal [of that order] if it remains possible to undo the effects of compliance or if the order will have a continuing impact on future action.'" *Larbie v. Larbie*, 690 F.3d 295,

305 (5th Cir. 2012) (alterations in original) (citation omitted). So long as an appellate court can "'affect the matter in issue,'" an appeal does not become moot merely because an event occurs that alters the status quo that existed when the case was originally filed. *See, e.g.*, *id.* (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).

This case is not moot. If the Court agrees with WWE's arguments, WWE will again have the ability to identify suspected counterfeiters, serve them with the pleadings and orders filed in this case, give notice of their opportunity for a hearing, and seize bootleg goods in a single process. As it currently stands, WWE must first identify or photograph suspected counterfeiters, reapply to the district court on a case-by-case basis for a separate seizure order and TRO against each, serve those orders on each defendant, and only then seize any counterfeit merchandise not yet destroyed or hidden. This effectively precludes WWE from obtaining relief under § 1116(d). With renewed access to that statutory remedy, WWE may more readily join an expanded pool of counterfeiters to the underlying action, reducing the amount of time it will spend attempting to obtain names, descriptions, photographs, and other identifying information of those in possession of counterfeit goods.

The Court's resolution of the issues raised here, then, will have a direct and immediate impact on course of proceedings in the district court and will provide

needed guidance to trademark owners in future seizure order cases. The district court *sua sponte* certified its order for interlocutory review for those very reasons. Circuit courts have declined to apply mootness in similar cases concerning issues related to requests for seizure orders. *See In re Vuitton et Fils*, 606 F.2d at 2 n.2, 3 n.5 (holding that counterfeit seizure order appeal qualified for exception to mootness because it raised question "obviously 'capable of repetition, yet evading review'" (quoting *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911)); *Vuitton*, 945 F.2d at 571 n.1 (holding that seizure order case fell within capable-of-repetition exception to mootness even though by the time of appeal "a seizure order [could not] be granted ex parte and may well [have been] ineffective").

"In the present ex parte procedural posture . . . what matters with respect to mootness is whether the party seeking the order can demonstrate that it is likely to request such orders in the future against some defendant . . . ." *See Bisan Food Corp.*, 377 F.3d at 319 (emphasis removed). WWE has requested seizure orders against fly-by-night counterfeiters almost every year since 2000, and it intends to do so in the future. WWE accordingly asks this Court to reach the issues presented in this appeal.

## CONCLUSION

WWE reasonably identified and located the suspected counterfeiters against whom it intends to seek *ex parte* relief under § 1116(d). Requiring more precise

identification of anonymous bootleggers essentially mandates that trademark owners give prior notice of their intent to seize counterfeit goods. Neither § 1116(d) nor due process requires that result, and there is no real dispute that WWE's evidence satisfied the remaining prerequisites to a counterfeit seizure order. Accordingly, WWE respectfully requests that this Court REVERSE the district court's ruling and REMAND for further proceedings.

Respectfully submitted,

Dated: July 21, 2014

_/s/ Danny S. Ashby_
Danny S. Ashby
danny.ashby@klgates.com
*Counsel of Record*
David I. Monteiro
david.monteiro@klgates.com
Justin R. Chapa
justin.chapa@klgates.com
K&L GATES LLP
1717 Main Street
Suite 2800
Dallas, Texas 75201
Telephone: 214.939.5500
Facsimile: 214.939.5849

*Counsel for Appellant*
*World Wrestling Entertainment, Inc.*

## **CERTIFICATE OF SERVICE**

I, Danny S. Ashby, an attorney, hereby certify that no other parties have entered an appearance in this case either on appeal or in the district court. Accordingly, there are no parties to this appeal who require service under Federal Rule of Appellate Procedure 25(b).


  */s/ Danny S. Ashby*  
Danny S. Ashby  
*Counsel for Appellant*  
*World Wrestling Entertainment, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Danny S. Ashby, certify that this proportionally-spaced brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).    Excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 6,457 words as determined by the word processing program used to prepare this brief, Microsoft Word 2010.

I further certify that (1) all privacy redactions have been made pursuant to Federal Rule of Appellate Procedure 25(a)(5); (2) that the electronic submission of this brief is an exact copy of the paper document submitted to the Court; and (3) that this document has been scanned for viruses with the most recent version of Symantec Endpoint Protection, a commercial virus scanning program, and is free of viruses.

 */s/ Danny S. Ashby*
Danny S. Ashby
*Counsel for Appellant*
*World Wrestling Entertainment, Inc.*

**Case No. 14-30489**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

### WORLD WRESTLING ENTERTAINMENT, INC.,

*Plaintiff – Appellant,*

**vs.**

### UNIDENTIFIED PARTIES,

*Defendants – Appellees.*

### STATUTORY APPENDIX TO APPELLANT'S BRIEF

Interlocutory Appeal from the United States District Court
for the Eastern District of Louisiana
Before the Honorable Judge Helen G. Berrigan
U.S.D.C. No. 2:14-CV-688

Danny S. Ashby
   *Counsel of Record*
David I. Monteiro
Justin R. Chapa
K&L GATES LLP
1717 Main Street
Suite 2800
Dallas, Texas 75201
214.939.5500


*Counsel for Appellant*
*World Wrestling Entertainment, Inc.*

July 21, 2014

# TEXT OF 15 U.S.C. § 1116

**(a)     Jurisdiction; service**

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found, and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found.

**(b)     Transfer of certified copies of court papers**

The said courts shall have jurisdiction to enforce said injunction, as provided in this chapter, as fully as if the injunction had been granted by the district court in which it is sought to be enforced. The clerk of the court or judge granting the injunction shall, when required to do so by the court before which application to enforce said injunction is made, transfer without delay to said court a certified copy of all papers on file in his office upon which said injunction was granted.

**(c)     Notice to Director**

It shall be the duty of the clerks of such courts within one month after the filing of any action, suit, or proceeding involving a mark registered under the provisions of this chapter to give notice thereof in writing to the Director setting forth in order so far as known the names and addresses of the litigants and the designating number or numbers of the registration or registrations upon which the action, suit, or

proceeding has been brought, and in the event any other registration be subsequently included in the action, suit, or proceeding by amendment, answer, or other pleading, the clerk shall give like notice thereof to the Director, and within one month after the judgment is entered or an appeal is taken the clerk of the court shall give notice thereof to the Director, and it shall be the duty of the Director on receipt of such notice forthwith to endorse the same upon the file wrapper of the said registration or registrations and to incorporate the same as a part of the contents of said file wrapper.

**(d)    Civil actions arising out of use of counterfeit marks**

> (1)    (A)    In the case of a civil action arising under section 1114(1)(a) of this title or section 220506 of Title 36 with respect to a violation that consists of using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, the court may, upon ex parte application, grant an order under subsection (a) of this section pursuant to this subsection providing for the seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation.
>
> (B)    As used in this subsection the term "counterfeit mark" means—
>
>> (i)    a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or
>>
>> (ii)    a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 220506 of Title 36;

but such term does not include any mark or designation used on or in connection with goods or services of which the manufacture or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

(2)    The court shall not receive an application under this subsection unless the applicant has given such notice of the application as is reasonable under the circumstances to the United States attorney for the judicial district in which such order is sought. Such attorney may participate in the proceedings arising under such application if such proceedings may affect evidence of an offense against the United States. The court may deny such application if the court determines that the public interest in a potential prosecution so requires.

(3)    The application for an order under this subsection shall—

(A)    be based on an affidavit or the verified complaint establishing facts sufficient to support the findings of fact and conclusions of law required for such order; and

(B)    contain the additional information required by paragraph (5) of this subsection to be set forth in such order.

(4)    The court shall not grant such an application unless—

(A)    the person obtaining an order under this subsection provides the security determined adequate by the court for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure or wrongful attempted seizure under this subsection; and

(B)    the court finds that it clearly appears from specific facts that—

(i)     an order other than an ex parte seizure order is not adequate to achieve the purposes of section 1114 of this title;

(ii)     the applicant has not publicized the requested seizure;

(iii)     the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;

(iv)     an immediate and irreparable injury will occur if such seizure is not ordered;

(v)     the matter to be seized will be located at the place identified in the application;

(vi)     the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and

(vii)     the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.

(5)     An order under this subsection shall set forth—

(A)     the findings of fact and conclusions of law required for the order;

(B)     a particular description of the matter to be seized, and a description of each place at which such matter is to be seized;

(C)     the time period, which shall end not later than seven days after the date on which such order is issued, during which the seizure is to be made;

(D)    the amount of security required to be provided under this subsection; and

(E)    a date for the hearing required under paragraph (10) of this subsection.

(6)    The court shall take appropriate action to protect the person against whom an order under this subsection is directed from publicity, by or at the behest of the plaintiff, about such order and any seizure under such order.

(7)    Any materials seized under this subsection shall be taken into the custody of the court. For seizures made under this section, the court shall enter an appropriate protective order with respect to discovery and use of any records or information that has been seized. The protective order shall provide for appropriate procedures to ensure that confidential, private, proprietary, or privileged information contained in such records is not improperly disclosed or used.

(8)    An order under this subsection, together with the supporting documents, shall be sealed until the person against whom the order is directed has an opportunity to contest such order, except that any person against whom such order is issued shall have access to such order and supporting documents after the seizure has been carried out.

(9)    The court shall order that service of a copy of the order under this subsection shall be made by a Federal law enforcement officer (such as a United States marshal or an officer or agent of the United States Customs Service, Secret Service, Federal Bureau of Investigation, or Post Office) or may be made by a State or local law enforcement officer, who, upon making service, shall carry out the seizure under the order. The court shall issue orders, when appropriate, to protect the defendant from undue damage from the disclosure of trade secrets or other confidential information during the course of the seizure, including, when appropriate, orders restricting the access of the applicant (or any agent or employee of the applicant) to such secrets or information.

(10)  (A)  The court shall hold a hearing, unless waived by all the parties, on the date set by the court in the order of seizure. That date shall be not sooner than ten days after the order is issued and not later than fifteen days after the order is issued, unless the applicant for the order shows good cause for another date or unless the party against whom such order is directed consents to another date for such hearing. At such hearing the party obtaining the order shall have the burden to prove that the facts supporting findings of fact and conclusions of law necessary to support such order are still in effect. If that party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

(B)  In connection with a hearing under this paragraph, the court may make such orders modifying the time limits for discovery under the Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of such hearing.

(11)  A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to recover such relief as may be appropriate, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith, and, unless the court finds extenuating circumstances, to recover a reasonable attorney's fee. The court in its discretion may award prejudgment interest on relief recovered under this paragraph, at an annual interest rate established under section 6621(a)(2) of Title 26, commencing on the date of service of the claimant's pleading setting forth the claim under this paragraph and ending on the date such recovery is granted, or for such shorter time as the court deems appropriate.